E. J. Adams v. Commissioner.
Adams v. Commissioner
Docket No. 15264.
United States Tax Court
1948 Tax Ct. Memo LEXIS 9; 7 T.C.M. (CCH) 965; T.C.M. (RIA) 48269; December 28, 1948
*9 During the taxable years 1939 to 1942, inclusive, petitioner bought and sold lumber in carload lots on his own account. The only records he kept were duplicate deposit slips, memoranda, and cancelled checks. In reporting his income he estimated his profit from such sales and reported it as either commissions or brokerage. In each year he failed to report large amounts of his correct income. Held, a part of the deficiencies resulting from such understatements was due to fraud with intent to evade tax and fraud penalties were correctly imposed by the Commissioner. Richard W. Wilson, Esq., 74 Trinity Place, New York, N. Y., for the petitioner. George J. LeBlanc. Esq., for the respondent. BLACK involves deficiencies in income tax and 50 per cent fraud penalties determined by the respondent against petitioner for the calendar years 1939 to 1942, inclusive, as follows: Year
Deficiency
Penalty
1939
$ 456.61
$1,850.72
1940
393.93
2,168.66
1941
2,021.03
8,036.65
1942
9,387.11
4,693.56
The amount of the penalty determined for each year is 50 per cent of the difference between the total tax assessable for each year and the amount previously *10 assessed on the original return. A part of this difference was assessed on amended returns for the years 1939, 1940 and 1941, and a small part ($77.64) of this difference for the year 1939 was assessed as a deficiency during November or December 1940. In a statement attached to the deficiency notice the respondent said: "The 50% penalty shown herein has been asserted in accordance with the provisions of Section 293(b) of the Internal Revenue Code." The deficiency for each of the taxable years here involved is due to numerous adjustments made by the respondent to the net income as disclosed by the return. Petitioner by appropriate assignments of error contests (a) the determination of the penalties; (b) a part or all of most of the adjustments to the net income; (c) the failure to allow the legal earned income credit to petitioner for all years; and (d) the failure to allow legal depreciation on petitioner's buildings and automobiles used in connection with petitioner's business for all years. In his petition he prays that an order be entered finding no deficiencies, and no penalties, and further that petitioner has overpaid his income taxes for all the *11 years here involved. In his answer the respondent affirmatively alleges that petitioner is guilty of fraud for all the years here involved. At the hearing petitioner, through his counsel, conceded the correctness of the tax liability as determined by the respondent for all the years here involved, thus waiving all the assignments of error in his petition with the exception of fraud. In making this concession petitioner, through his counsel, contends however that for the year 1942 he automatically would be entitled to the benefits of section 6 of the Current Tax Payment Act of 1943 in the event this Court should find that no part of the deficiency for 1942 was due to fraud with intent to evade tax. Findings of Fact Petitioner is an individual residing at Huntington, West Virginia. He filed income tax returns for the calendar years 1939 to 1942, inclusive, with the Collector at Parkersburg, West Virginia. During the taxable years here involved (1939 to 1942, inclusive) petitioner was engaged in the sale of lumber in carload lots for others, for which he received commissions and was also engaged in the purchase and sale of lumber in carload lots for his own account. Petitioner *12 solicits orders from retailers for carload lots of lumber. When such orders are obtained petitioner contacts various mills for the purpose of purchasing lumber for that particular order and the lumber so purchased is shipped directly to the customer. The sale to petitioner is usually on a sight draft basis and petitioner pays the draft and then bills the customer for the agreed price. Petitioner carries no inventory of lumber on hand, all purchases made by him being for a particular order. Practically all, if not all, cars of lumber sold by petitioner during the years under review were sold f.o.b. destination. In such cases the consignee pays the freight bill and deducts the amount thereof from the amount due petitioner. In some instances an order is cancelled after it has been shipped from the mill. In those cases it is necessary to find another buyer and the destination of the shipment is changed while en route. Adjustments of the agreed price of the lumber are sometimes necessary after shipments have been inspected by the customer for the reason that such lumber may not meet the minimum requirements of the grade sold. In some such cases, but not in all, the shipper will make an *13 allowance to petitioner therefor. Loss is sometimes sustained on such shipments. Petitioner's first contact with the lumber business was in 1909 or 1910 when he was employed during summer vacations by the Knoxville Lumber & Manufacturing Co., at Knoxville, Tennessee. His work consted of making out statements, answering the telephone and figuring small bills and estimates. On January 1, 1913 petitioner went to Birmingham to work for the Steel City Lumber Company, a wholesale lumber concern, as thei representative on the road. His duties were to call upon and sell to their customers. Near the end of 1913 petitioner was engaged by the Pine & Cypress Manufacturing Company, also a wholesale lumber company, and his sales territory consisted of West Virginia, Kentucky and a part of Ohio and Tennessee. Petitioner changed his residence to Huntington, West Virginia in 1914 where he has resided continuously to date. In 1929 petitioner made a connection with the Pine Plume Lumber Company in Montgomery, Alabama, and also the Standard Lumber Company in Birmingham, traveling on the road, selling lumber on a commission basis. He also sold some lumber for other companies, some six or seven in all. *14 Petitioner never had any training or experience in the clerical, office, administrative or executive branches of the lumber business, his activities being limited to selling on a commission basis. Beginning in 1937 petitioner occasionally bought and sold a carload of lumber as principal, in addition to his commission business. He gradually increased his own purchases and sales during 1938 and 1939, switching over from the commission to the wholesale business. During the four-year period 1939 to 1942 he devoted his time and efforts almost entirely to the wholesale business, retaining only two or three commission accounts. During the taxable years, petitioner's office was in his home in Huntington. Aside from his traveling, all business was transacted at his home, largely by telephone. Petitioner's wife was at that time employed in Charleston by the W.P.A. She was home only on Saturdays and Sundays. Petitioner was away from home two or three days each week on business. He had no stenographer, bookkeeper or clerical help of any kind except that he did employ a Mr. Daniel to prepare his 1939 return and a Mr. Holley to prepare his 1940, 1941 and 1942 returns. He bought, sold and *15 collected without help. During the taxable years here involved petitioner did not keep a complete set of books. His records consisted of duplicate deposit slips to which are attached memoranda showing the source of each of the items included in the particular deposit, checkbook stubs and cancelled checks. In the original returns filed by petitioner for the taxable years in question he reported taxable net income as follows: Year
Taxable Net Income
1939
$ 8,367.31
1940
11,563.52
1941
9,430.72
1942
14,412.01 Included in the gross income reported as "Salaries and Other Compensation for Personal Services" which is Item 1 on the returns are items designated as "Sundry Commissions," "Miscellaneous Brokerage," "Commissions" and "Brokerage Commissions" in the amounts of $7,750, $9,786.45, $11,565.40 and $21,085.76 for the years 1939, 1940, 1941 and 1942, respectively. These amounts represent the estimates which petitioner used of the gross profits realized by him from the purchase and sale of lumber for his own account during these years, which amounts were given by petitioner to Daniel and Holley at the time they prepared his returns. The petitioner did not furnish *16 to Daniel and Holley invoices and records which showed purchases and sales of lumber. The returns nowhere disclose the fact that petitioner was engaged in the wholesale lumber business as a principal nor do such returns disclose the amount of sales and the cost of the lumber sold. At some time during 1940 and prior to the time petitioner's return for 1940 was due to be filed, petitioner's return for the year 1939 was examined by an Internal Revenue agent named Lauhon. He proposed some minor adjustments relating to automobile depreciation and a donation, which adjustments resulted in a small deficiency of $77.64 which was assessed during November or December of 1940. He made no adjustment relative to the amount of $7,750 reported by petitioner as sundry commissions. Daniel who had prepared the 1939 return and some of the returns for years prior thereto was a lawyer and an accountant. Holley who prepared the returns for 1940, 1941 and 1942 was an accountant with offices in Huntington. The switch from Daniel to Holley was made because Daniel was so frequently out of town or tied up in court that petitioner had difficulty contacting him or getting his work done. Subseqpent to Lauhon's *17 examination of petitioner's 1939 return, petitioner received no word, verbally or in writing, from the Bureau of Internal Revenue concerning any of his income tax returns until sometime in 1943, after his returns for 1940, 1941 and 1942 had been filed, when Lauhon telephoned petitioner that he was to audit petitioner's 1941 return. About two weeks later, Lauhon informed petitioner that his 1941 return seemed to be "out of kilter." Petitioner advised Lauhon that if his 1941 returns were wrong, then the 1942 return was also wrong because they had both been prepared on the same basis. At the same time petitioner and Holley went over petitioner's data for 1942 and a first amended return was prepared and later filed. This amended return overstated petitioner's true net income for the year 1942 by approximately $12,400. Early in November 1943 Special Agent Lathem entered the case. The first amended return for 1942 was then in course of preparation but had not yet been filed. Petitioner conferred with Lathem a number of times concerning his tax liability for 1939, 1940, 1941 and 1942 and supplied him with all data requested, explained to him how he had computed his profits for each of the *18 years in question, and was generally cooperative and helpful in assisting the revenue agent and Special Agent Lathem in their investigation. In March 1944 petitioner received a communication from the Bureau inviting him to a conference in Washington, D.C. in connection with his income tax liability for the years then under investigation. Petitioner, accompanied by Holley, attended a conference on April 13, 1944. It was at this conference that petitioner for the first time learned that Holley was not a certified public accountant and, therefore, could not represent him before the Treasury Department. Upon his return to Huntington, petitioner engaged N. G. Somerville, a certified public accountant with offices in Huntington, to prepare amended returns for all of the four years. These returns were filed in May 1945. For several years prior to 1939 petitioner carried an account and made loans from the First Huntington National Bank. After 1940 his bank account and loans were with the First National Bank of Ceredo, Ceredo, West Virginia. An outstanding loan with the Huntington Bank was charged off in 1934 because of petitioner's inability to pay. Later he resumed payments and liquidated *19 the indebtedness. Petitioner's ledger account with the First Huntington National Bank for the taxable years here involved shows the following: Petitioner's balance January 1, 1939
$ 10.25
Total deposits for 1939
4,896.63
Total of balance and deposits
4,906.88
Total checks cashed in 1939
$ 4,895.81
Total charges by Bank
3.63
4,899.44
Balance December 31, 1939
7.44
Total deposits for 1940
14,268.98
Total of balance and deposits
14,276.42
Total checks cashed in 1940
$14,257.17
Total charges by Bank
3.77
14,260.94
Balance December 31, 1940
15.48
Total deposits for 1941
3,490.98
Total of balance and deposits
3,506.46
Total checks cashed in 1941
$ 3,499.96
Total charges by Bank
2.74
3,502.70
Balance December 31, 1941
3.76
Total charges by Bank for 1942
1.00
Balance December 31, 1942
$ 2.76
A summary of petitioner's balances, deposits and checks written at the First National Bank of Ceredo during the taxable years is as follows (amounts in parentheses are overdrafts): 1939
1940
1941
1942
Actual balance, beginning
($ 661.41)
$ 8,805.00
($ 4,114.89)
$ 412.44
Checks outstanding, beginning
4,696.05
846.28
4,310.60
3,113.37
Bank balance, beginning
4,034.64
9,651.28
195.71
3,525.81
Total deposits
278,856.56
330,133.59
390,898.86
587,141.70
Total
282,891.20
339,784.87
391,094.57
590,667.51
Checks cashed
273,239.92
339,589.16
387,568.76
559,236.07
Bank balance, end
9,651.28
195.71
3,525.81
31,431.44
Checks outstanding, end
846.28
4,310.60
3,113.37
14,244.75
Actual balance, end
$ 8,805.00
(4,114.89)
412.44
17,186.69
*20 Lathem analyzed the duplicate deposit slips with the accompanying memoranda of both banks and determined that the deposits were from the following sources: 1939
1940
1941
1942
Lumber sales
$279,192.16
$335,447.78
$372,012.46
$568,308.50
Commissions on sales
1,321.95
2,447.88
2,512.91
1,713.01
Miscellaneous income
29.78
Transfers and exchanges
3,149.30
3,458.87
2,270.00
12,661.63
Rents collected
3,048.04
4,946.62
4,448.56
Nontaxable item
12,647.85
Tax refund
10.00
Unaccounted for
60.00
Total deposits
$283,753.19
$344,402.57
$394,389.84
$587,141.70
Deposited in Ceredo Bank
278,856.56
330,133.59
390,898.86
587,141.70
Deposited in Huntington Bank
$ 4,896.63
$ 14,268.98
$ 3,490.98
None
Lathem also analyzed the cancelled checks and determined that the amount of money expended for each taxable year was as follows: 1939
1940
1941
1942
First National Bank of Ceredo: Checks actually cashed
$273,239.92
$339,589.16
$387,568.76
$559,236.07
Less checks outstanding, beginning
4,696.05
846.28
4,310.60
3,113.37
Balance
$268,543.87
$338,742.88
$383,258.16
$556,122.70
Add checks outstanding, end
846.28
4,310.60
3,113.37
14,244.75
Expended for the year
269,390.15
343,053.48
386,371.53
570,367.45
First Huntington National Bank: Checks cashed and charges
4,899.44
14,260.94
3,502.70
1.00
Total expended for the year
$274,289.59
$357,314.42
$389,874.23
$570,368.45
*21 Lathem also determined that petitioner expended the above amounts for lumber purchases, business expenses and for his personal use, as follows: 1939
1940
1941
1942
Lumber purchases
$247,695.85
$309,726.11
$325,451.20
$523,707.17
Business expenses
2,826.87
4,124.40
9,357.51
14,430.81
Personal
23,757.52
43,463.91
55,015.52
32,229.47
Missing check
50.00
Unaccounted for
9.35
1.00
Total expended for the year
$274,289.59
$357,314.42
$389,874.23
$570,368.45
The above amounts expended for personal use included expenditures for the following: 1939
1940
1941
1942
Household and personal
$ 8,996.00
$12,870.45
$ 7,866.78
$11,542.81
Insurance premiums (life, automobile and residence)
2,192.57
2,713.30
3,301.43
3,559.35
New automobiles
943.75
1,734.68
Acquisition and improvement of investment real estate
5,806.10
10,410.37
11,312.10
35.00
Payments on bank loans originating prior to 1939
2,607.00
6,000.00
5,290.00
4,500.00
Interest on such loans
205.55
369.00
2,115.49
4,737.32
Payments on mortgages
2,628.92
5,786.18
408.03
Purchase of securities
5,292.00
16,805.20
2,230.00
Totals
$20,750.97
$40,284.04
$54,211.86
$27,012.51
*22 The respondent determined and the parties have stipulated that petitioner's correct taxable net income for each of the taxable years here in question is as follows: Correct Taxable
Year
Net Income
1939
$31,529.99
1940
28,493.39
1941
44,534.17
1942
31,591.26
In arriving at the above correct taxable net income the respondent adjusted the amounts of lumber sales and lumber purchases from what Lathem had determined to amounts, as follows: Lumber
Year
Lumber Sales
Purchases
1939
$279,192.14
$248,346.91
1940
334,213.78
309,717.09
1941
371,881.11
325,451.20
1942
566,227.46
522,707.17
A portion of the deficiencies determined by the respondent for the taxable years 1939 to 1942, inclusive, is due to fraud with intent to evade tax. Opinion BLACK, Judge: The principal question here is whether the respondent erred in determining fraud penalties against petitioner for the taxable years 1939, 1940, 1941 and 1942. The only other question is whether petitioner would automatically be entitled to the benefits of section 6 of the Current Tax Payment Act of 1943 in the event that this Court should find that no part of the deficiency *23 for 1942 was due to fraud with intent to evade tax. We will first consider the fraud issue. The applicable sections of the Internal Revenue Code are sections 293(b) and 1112 which are in the margin.[1] "Fraud is a fact to be proven by clear and convincing evidence." Charles E. Mitchell, 32 B.T.A. 1093, 1128. There is no burden upon the respondent to prove his case beyond a reasonable doubt since the sanction imposed by section 293(b) is civil and not criminal. Helvering v. Charles E. Mitchell, 303 U.S. 391. The burden is upon the respondent to prove that a part of the deficiency for each year is due to fraud with intent to evade tax and this he must do by clear and convincing evidence. *24 We think the respondent has met his burden of proof in this case and we have so found as an ultimate fact in our findings of fact. Petitioner concedes that the net income determined by the respondent for each year is the correct taxable net income. The amounts so determined by the respondent are substantially in excess of the amounts reported by petitioner as our findings clearly show. In no year did the petitioner report more than 45 per cent of his correct net income and in 1941 it was only a little over 21 per cent. In that year he reported $9,430.72 whereas the correct net income for that year is $44,534.17. Petitioner's principal source of income was profit from the purchase and sale of lumber in carload lots on his own account, yet nowhere on his returns did he indicate that to be a fact. He stated his principal occupation or profession as "Salesman", "Commission Brokerage", "Lumber Broker & Commission Salesman", and "Commission Salesman", respectively, and among other items of gross income reported $7,750 as sundry commissions for 1939, $9,786.45 as miscellaneous brokerage for 1940, $11,565.40 as undesignated commissions for 1941 and $21,085.76 as brokerage commission for *25 1942. He intended these amounts to represent his gross profit from the sale of lumber in carload lots on his own account but he reported nothing in his returns in the schedules provided for the detailed computation of "Net Profit (or Loss) from Business or Profession." As indicated in our findings of fact petitioner's sales, cost of lumber sold, gross profit realized and gross profit reported, were as follows: Lumber
Cost of
Gross Profit
Year
Sales
Lumber Sold
Realized
Reported
1939
$279,192.14
$248,346.91
$30,845.23
$ 7,750.00
1940
334,213.78
309,717.09
24,496.69
9,786.45
1941
371,881.11
325,451.20
46,429.91
11,565.40
1942
566,227.46
522,707.17
43,520.29
21,085.76
Petitioner's explanation for his failure to report a gross profit more nearly in line with that which was realized was that in estimating the gross profit per car he had failed somehow to take into consideration the substantial rise in the price of lumber during the taxable years. We must consider this a weak explanation when considered in connection with the fact that petitioner did not even report he was selling lumber on his own account or that he was estimating *26 his profits. It would seem also that the large amounts petitioner was spending each year for his personal account would have been an indication to him that the net income he was reporting was much too small. Amounts spent during the taxable years for household expenses, insurance premiums, new automobiles, real estate, payment of back loans, interest, mortgages and securities amounted to at least $20,750.97, $40,284.04, $54,211.86 and $27,012.51, respectively. These amounts are considerably in excess of the income reported for these years. Notwithstanding these expenditures, petitioner's actual cash balance at the banks improved over the four-year period by $17,840.61. It does not seem reasonable that petitioner could have been unaware of these improvements to his overall financial position. The only inference that we can reasonably draw from such evidentiary facts is that petitioner intended his returns to be false and fraudulent and that in filing them he intended to evade a part of the taxes which he lawfully owed. Cf. Rogers v. Commissioner, 111 Fed. (2d) 987, affirming 38 B.T.A. 16; Louis Halle, 7 T.C. 245. In the Rogers case the Sixth *27 Circuit, among other things, said: "Fraud cannot be lightly inferred, but must be established by clear and convincing proof. Duffin v. Lucas, 6 Cir., 55 Fed. (2d) 786. It is conceivable that taxpayers may make minor errors in their tax returns, or, owing to different or contradictory theories of tax computation, calculate returns which differ greatly in result from the Commissioner's assessments. Here petitioners do not have that excuse. Discrepancies of 100% and more between the real net income and the reported income for three successive years strongly evidence an intent to defraud the Government. The Board did not err in deciding that 50% penalties should be assessed." Petitioner contends that in view of the fact that Lauhon did not make any adjustment relative to the amount of $7,750 reported by petitioner as sundry commissions when he examined his 1939 return during the year 1940, he was led to believe that his method of estimating the profits on each car of lumber bought and sold was acceptable to the Government and that the Government should share some of the blame for the gross understatements of income in the later years. We do not know all the circumstances *28 under which this examination by Lauhon was made. Lauhon was not called as a witness by either party. We are, however, unable to see wherein Lauhon's failure to discover petitioner's gross understatement of his profits for 1939 would in any way justify petitioner in continuing to understate his profits for the following years when from all the evidence in petitioner's possession he must have known his profits were much larger then he was reporting. The evidence most favorable to petitioner is that he preserved substantially all of his duplicate deposit slips, memoranda and cancelled checks and that he cooperated at all times with the agents sent to examine such records. The agents were thus able, with petitioner's help, to determine his correct taxable net income for all the years here involved. We have given careful consideration to this evidence but nevertheless after giving it full consideration we have been unable to conclude that petitioner did not know he was filing false and misleading income tax returns in each of the taxable years. We are convinced after carefully weighing all of the evidence that a part of the deficiencies herein is due to fraud with intent to evade tax. *29 We hold, therefore, that the respondent was correct in determining the fraud penalties here in question. It thus becomes unnecessary to consider petitioner's further contention relative to the benefits of section 6 of the Current Tax Payment Act of 1943. He could only have the benefit of that section if we found there was no fraud. Decision will be entered for the respondent. Footnotes
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2). SEC. 1112. BURDEN OF PROOF IN FRAUD CASES. In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner.↩